JASON ALLEN OLRICH,

                Plaintiff,

v.                                              Case No. 18-cv-1985-pp

KENOSHA COUNTY, *et al.*,

                Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING MOTION TO FILE AMENDED COMPLAINT (DKT. NO 13), DENYING WITHOUT PREJUDICE MOTION TO APPOINT COUNSEL (DKT. NO. 9), DENYING MOTION TO CERTIFY CLASS (DKT. NO. 5) AND SCREENING ORIGINAL COMPLAINT (DKT. NO. 1)**

The plaintiff, who is representing himself, filed a complaint under 42 U.S.C. §1983, alleging that the defendants violated his civil rights. Dkt. No. 1. This decision resolves the plaintiff's motion for leave to proceed without prepaying the filing fee, dkt. no. 2, denies his motion to amend the complaint, consolidate cases and stay screening, dkt. no. 13, and screens his original complaint, dkt. no. 1. It also denies the plaintiff's amended motion to appoint counsel, dkt. no. 9, and his motion to certify class, dkt. no 5.

**I.   Motion for Leave to Proceed without Prepaying Filing Fee (Dkt. No. 2)**

The Prison Litigation Reform Act applies to this case because the plaintiff was incarcerated when he filed his complaint. 28 U.S.C. §1915. That law allows a court to give an incarcerated plaintiff the ability to proceed with his lawsuit without prepaying the civil case filing fee if he meets certain conditions. One of

those conditions is that the plaintiff pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On December 18, 2018, the court ordered the plaintiff to pay an initial partial filing fee of $0.71. Dkt. No. 7. The court received that fee on January 2, 2019. The court will grant the plaintiff's motion for leave to proceed without prepayment of the filing fee and require him to pay the **$348.58** balance of the filing fee as he is able.

## II. Motion to File Amended Complaint, Stay Screening and to Consolidate with Case 18-cv-1980 (Dkt. No. 13)

The plaintiff filed a motion titled "Motion to File Amended Complaint." Dkt. No. 13 at 1. The caption of the motion listed three case numbers—this one, 18-cv-1980 and Case No. 18-cv-1518. Id. at 2. The motion cited Fed. R. Civ. P. 15(a)(2), which requires a party to obtain leave of court to amend the complaint if more than twenty-one days have passed since the filing of the original complaint. Id. The motion also asked the court to delay screening all three cases until after the plaintiff had filed amended complaints, which he said he'd be doing in the next three weeks. Id. He told the court that he needed to amend the complaints because they were "facially bald" and didn't show how his rights were violated and listed defendants who weren't involved in violating his rights; he claims this is because he got "faulty advice and assistance" from another inmate. Id. at 1-2.

The motion also asked the court to consolidate this case with Case No. 18-cv-1980, and to allow him to file a single amended complaint for both. Id. at 2. He explained that "the issues can and should be brought in one action as some of the defendant(s) will be the same in both case(s)." Id.

The Federal Rules of Civil Procedure provide that a court may consolidate cases only if those cases share "a common question of law or fact." Fed. R. Civ. P. 42(a). This case alleges that in mid-January 2018 while he was at the Kenosha County Jail, another inmate sexually harassed him, and that when he told the defendants, the defendants did nothing about it. Dkt. No. 1. In Case No. 18-cv-1980, the plaintiff alleged that while he was at Kenosha County Jail in December 2017, he was fed spoiled meat which made him sick, and that despite his complaints, the defendants did nothing. See Olrich v. Kenosha County, Case No. 18-cv-1980, at Dkt. No. 1. The allegations in the two cases do not share a common question of fact or law. They involve different incidents on different dates. The only thing they have in common is that they involve some of the same defendants.

The court will not grant the plaintiff leave to file the amended complaint, because it includes both the allegations regarding the spoiled meat and the allegations of indifference to sexual harassment by a fellow inmate. The plaintiff cannot join these unrelated claims in the same lawsuit. See George v. Smith, 507 F.3d 605, 607 (7th Cir. 2007) ("Unrelated claims against different defendants belong in different suits . . . .").

For the same reason, the court will deny the plaintiff's request to consolidate this case with Case No. 18-cv-1980. It also will deny as moot the plaintiff's request to stay screening until he filed the amended complaint.

The original complaint is the operative complaint, and that is the complaint the court screens here.

**III.     Screening the Complaint (Dkt. No. 1)**

    A.     <u>Federal Screening Standard</u>

Although the plaintiff has demonstrated that he does not have the money to pay the filing fee, the court must dismiss a complaint if the plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b). For this reason, district courts "screen" complaints filed by self-represented plaintiffs to determine whether the complaint must be dismissed under these standards.

To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id</u>. (citing <u>Twombly</u>, 550 U.S. at 556).

To state a claim under 42 U.S.C. §1983, a plaintiff must allege that: 1) he was deprived of a right secured by the Constitution or laws of the United States; and 2) the defendant was acting under color of state law. <u>Buchanan-

Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004)); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980). The court gives a *pro se* plaintiff's allegations, "however inartfully pleaded," a liberal construction. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

B. The Plaintiff's Allegations

The plaintiff has sued ten defendants—Kenosha County, the Kenosha County Detention Center, the Kenosha County Jail, Sheriff David Beth, "Jail Administrator," Corporal Parker, John/Jane Doe correctional officer #1, correctional officer Julian, John/Jane Doe correctional officer #2, and correctional officer Haynes. Dkt. No. 1 at 3-4.

The plaintiff alleges that around January 1, 2018, the plaintiff was an inmate at Kenosha County Detention Center ("KCDC"). Id. at 5. That day, defendant Parker moved the plaintiff from G-North to E-North. E-North houses federal inmates and Immigration and Customs Enforcement (ICE) detainees; the plaintiff says he was neither a federal inmate nor an ICE detainee. Id. The plaintiff asserts that around January 12, 2018, an immigration detainee who went by the name "Daniel" began to sexually harass the plaintiff. Id. Daniel told the plaintiff, for example, that he wanted "to suck Plaintiff's dick, fuck the Plaintiff, and be Plaintiff's boyfriend." Id.

The plaintiff says that he told defendant C.O. John Doe #1, but that he laughed about the incident. Id. The plaintiff alleges that few days later, on

5

January 15, 2018, he was utilizing computer in the multi-purpose room to do research. Id. He says that Daniel came in and started to make more sexual comments toward him. Id. The plaintiff says that Daniel told the plaintiff he was handsome and "that he wanted to suck the Plaintiff's dick." Id. The plaintiff says he told Daniel that he was not interested in him and asked him to stop. Id. The plaintiff says that Daniel then came over to the plaintiff and started to rub the plaintiff's hand; the plaintiff says he smacked Daniel's hand away. Id. The plaintiff relates that Daniel then grabbed the front of the plaintiff's clothes—over his penis—and the plaintiff again smacked away Daniel's hand. Id. The plaintiff says he told defendant Julian, but that Julian did nothing about it. Id.

  The plaintiff asserts that about four days later, around January 19, 2018, the plaintiff and another immigration detainee, last name Domingo, were sitting in the dayroom talking. Id. at 6. The plaintiff says that Daniel came in and sat next to the plaintiff and started to rub his hand. Id. The plaintiff says that he smacked away Daniel's hand and asked him to stop and to leave the plaintiff alone. Id. The plaintiff says that while he was looking at Domingo, Daniel stuck his hand down the plaintiff's pants and grabbed his penis. Id. The plaintiff explains that he got up and walked away; he went and told John Doe #2, who did nothing. Id. The plaintiff says that later the same day, he told defendant Parker about what Daniel had done, but the plaintiff says nothing was done about it. Id.

6

The plaintiff relates that the next day—January 20, 2018—he was sitting on his bunk, which faced the shower area, when he saw an ICE detainee named Romy was taking a shower. Id. The plaintiff says he saw Daniel go into the shower next to Romy, stick his "body and hands over the divider" and start touching Romy; the plaintiff says that Romy "yelled." Id. The plaintiff says that at that point, he stopped watching, because he didn't "want to see what was going on." Id. The plaintiff says that Romy reported the incident to the institution staff and filed an inmate grievance. Id. The plaintiff says that he, himself, tried to file a grievance "but it was never filed." Id. At some point, staff moved Daniel "out of the Dorm." Id. The plaintiff was moved to F-North, where he learned from another inmate that Daniel touched that inmate. Id. The plaintiff explains that around February 23, 2018, he transferred to Dodge Correctional Institution. Id.

About three weeks later, the plaintiff says he worked up the courage to file a Prison Rape Elimination Act ("PREA") complaint, which resulted in an investigation; the plaintiff also started talking to his psychiatrist about what had happened. Id. at 7. The plaintiff says that during the PREA investigation, he said that he wanted to file criminal charges against Daniel. Id.

The plaintiff relates that around May 11, 2018, he was transferred to Oshkosh Correctional Institution. Id. In late June 2018, two Kenosha detectives came to see the plaintiff at Oshkosh for the purpose of taking a statement about what had happened at KCDC. Id. The plaintiff says that the detectives had him identify Daniel out of a photo array. Id. They also had him

7

identify Romy. Id. The plaintiff says the detectives told him that other people at KCDC said that Daniel had sexually assaulted them. Id. The plaintiff asserts that he told the detectives everything he knew; he says he told them that he had told Parker, who had done nothing, and that John Doe #1, John Doe #2 and Julian "wouldn't file any of his grievances." Id. The plaintiff says he told the detectives that Haynes "had hit him for no reason." Id. The plaintiff claims that he told the detectives that that Parker "shipped [him] downtown and made him sleep on the floor with no water" when the plaintiff filed a grievance "on anything." Id. He alleges that this was because the plaintiff filed a grievance about black mold in the showers "and that the cleaning of non-sentenced inmates and everything else that happened to him" at the Kenosha County Jail and KCDC. Id. The plaintiff says the detectives responded that they were there only to investigate the allegations of sexual assault by Daniel. Id. at 8.

For relief, the plaintiff asks the court to require the defendants to create new PREA policies and to house inmates according to their classification. Id. He also asks for compensatory and punitive damages, fees, and costs. Id. at 8-9.

### C. The Court's Analysis

The court first notes that the plaintiff cannot sue the Kenosha County Jail or the Kenosha County Detention Center under §1983. Federal Rule of Civil Procedure 17(b) requires that a defendant in a federal lawsuit have the legal capacity to be sued. State law determines whether an entity has that capacity. Webb v. Franklin Cty. Jail, No. 16-cv-1284, 2017 WL 914736, at *2

(S.D. Ill. Mar. 8, 2017). The jail and detention center are arms of the sheriff's department, and the sheriff's department is an arm of the county. See Abraham v. Piechowski, 13 F. Supp.2d 870, 877-79 (E.D. Wis. 1998). This means that jails and sheriff's departments are not "legal entit[ies] separable from the county government which [they] serve[] . . . ." Whiting v. Marathon Cty. Sheriff's Dep't, 382 F.3d 700, 704 (7th Cir. 2004)). In other words, the Kenosha County Jail and Kenosha County Detention Center do not have the capacity to be sued separately from Kenosha County.

Though the plaintiff has listed Kenosha County as a defendant, he has not made allegations that support a claim against the county. "A municipality cannot be held liable for a constitutional violation in the absence of a custom, policy or practice that effectively caused or condoned the alleged constitutional violations." Matthews v. City of E. St. Louis, 675 F.3d 703, 708 (7th Cir. 20120) (citing, *e.g.*, Wragg v. Vill. of Thornton, 604 F.3d 464, 467 (7th Cir. 2010); Monell v. New York Dep't of Soc. Servs., 436 U.S. 658 (1978)). The plaintiff has not alleged any such custom, policy or practice.

Nor does the complaint state a claim against the sheriff or the unnamed Jail Administrator. It appears that the plaintiff has sued these two defendants because they were supervisors—they ran the jail or detention center during the time Daniel allegedly sexually harassed the plaintiff. To show that a supervisor is liable under §1983, a plaintiff must show that the supervisor was "personally responsible for the deprivation of a constitutional right." Matthews, 675 F.3d at 708 (7th Cir. 2012) (quoting Chavez v. Ill. State Police, 251 F.3d 612, 651 (7th

9

Cir. 2001)). "To show personal involvement, the supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.' *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)." Id. The plaintiff has not alleged that the sheriff or the jail administrator knew about the issue with Daniel, or that they facilitated, approved, condoned or turned a blind eye to it.

The complaint does not state a claim against correctional officer Haynes. The plaintiff does not allege that Haynes was involved in the situation with Daniel. He says only that he told the Kenosha detectives that Haynes hit him for no reason. This allegation is not sufficient to state a claim of a constitutional violation, and even if it was, the plaintiff would have to file a separate complaint if he wanted to make a claim against Haynes for an unrelated constitutional violation.

This leaves defendants Corporal Parker, John Doe #1, John Doe #2 and Julian. According to the complaint, the plaintiff told all four defendants that Daniel sexually harassed him and none of them did anything. He also says that Julian failed to file the plaintiff's grievances about the incidents with Daniel.

"The Eighth Amendment's prohibition of 'cruel and unusual punishments' obligates prison officials to 'take reasonable measures to guarantee the safety of . . . inmates.' *Farmer v.* Brennan, 511 U.S. 825, 832 . . . (1994) (quoting *Hudson v.* Palmer, 468 U.S. 517, 526-27 . . . (1984)." Sinn v. Lemmon, 911 F.3d 412, 419 (7th Cir. 2018). To state a failure-to-protect claim under the Eighth Amendment, the plaintiff must show that the defendants

10

were deliberately indifferent to "an excessive risk to inmate health or safety[.]"[1] Id. (quoting Gevas v. McLaughlin, 798 F.3d 475, 480 (7th Cir. 2015). There are two components the plaintiff must demonstrate: "(1) 'the harm to which the prisoner was exposed must be an objectively serious one'; and (2) judged subjectively, the prison official 'must have actual, and not merely constructive, knowledge of the risk.'" Id. To demonstrate the second component, a plaintiff must show that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. (quoting Farmer, 511 U.S. at 837).

At this early stage, the plaintiff has alleged sufficient facts to state a claim that he was exposed to an objectively serious risk of sexual harassment, and that all four defendants knew about the harassment (and therefore the threat of continued harassment) and failed to act, subjecting the plaintiff to potential harm (and harm that actually occurred). The court will allow the plaintiff to proceed against all three on a claim that they failed to protect him.

---

[1] The court cannot tell from the complaint whether the plaintiff was a pretrial detainee or a sentenced prisoner at the time of these events. In the past, a pretrial detainee's claim of deliberate indifference was governed by the Fourteenth Amendment standard. Smith v. Sangamon Cty. Sheriff's Dept., 715 F.3d 188, 191 (7th Cir. 2013). Recent case law suggests, however, that courts are moving to an objective standard when looking at pretrial detainees' claims that would arise under the Eighth Amendment if those detainees were convicted prisoners. See Reed v. Bowen, 2019 WL 1873026, at *2 (7th Cir. April 26, 2019) (citing Kingsley v. Hendrickson, ___ U.S. ___, 135 S. Ct. 2466, 2475 (2015)). Because the plaintiff does not state whether he was a pretrial detainee or a sentenced prisoner at the time of the events involving Daniel, the court applies the more stringent Eighth Amendment standard—if the plaintiff is able to state a claim under the Eighth Amendment, he also will state a claim under the less-stringent Fourteenth Amendment standard.

Once the known defendants answer, the plaintiff will have the opportunity to conduct discovery, including discovery to learn the identities of John Does #1 #2.

**IV.    Amended Motion to Appoint Counsel (Dkt. No. 9)**

The plaintiff also filed a motion to appoint counsel, dkt. no. 4, which was then replaced by an amended motion to appoint counsel, dkt. no. 9. In a civil case, the court has discretion to recruit a lawyer for individuals who cannot afford to hire one. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Pennewell v. Parish et al., 923 F.3d 486, 490 (7th Cir. 2019), (quoting Pruitt v. Mote, 503 F.3d 647, 653 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Authority, 930 F.3d 869, 871 (7th Cir. 2019). To do so, the plaintiff must show he contacted at least three lawyers and provide the court with (1) the lawyers'

12

names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." Pennewell, 923 F.3d at 490. The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." Id. This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." Id. at 490-491. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other characteristics that may limit the plaintiff's ability to litigate the case." Id. at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." Pickett, 930 F.3d at 871.

The amended motion says that the plaintiff has written "countless lawyers" seeking help, and has been denied. Dkt. No. 9 at 2. He attached nine letters from lawyers declining to assist him, as well as a letter from the State Bar of Wisconsin indicating that its Lawyer Referral and Information Service does not make referrals in the area of constitutional law. Dkt. No. 9-1 at 9-19. The court is satisfied that the plaintiff made a good faith effort to find counsel

on his own, satisfying the first prong of the Pruitt requirements. The remaining question is whether the plaintiff is competent to litigate his case himself.

The plaintiff explains that he can't afford a lawyer, that the case is complex and that he suffers from diagnosed mental illness (which he describes in detail). Dkt. No. 9 at 1. The plaintiff notes that he struggles with time management, organization, memorization and the ability to concentrate. Id. He also references his need for more time and special help to take tests, do his homework and understand words. Id. He says that he has hallucinations and is on an off suicide watch. Id. He notes that he has only limited knowledge of the law, and that he has very limited access to the law library. Id. at 2.

Some of the issues the plaintiff identifies in his amended motion are issues that most incarcerated plaintiffs struggle with—the inability to hire a lawyer, lack of knowledge of the law, limited time in the law library. The plaintiff's situation is complicated, however, by what appears to be severe mental illness. It certainly sounds as though his illness makes it hard for him to concentrate and focus, and perhaps to remember and meet deadlines. It isn't clear, but he may also have difficult accessing his legal documents, or the law library, if he is on suicide lock-down. The court takes these concerns seriously.

At this early stage, however, the plaintiff has managed to file (apparently with the help of another inmate) both a complaint and an amended complaint, as well as a motion for class certification and an original and amended motion to appoint counsel. The court has been able to understand his allegations; he writes clearly and understandably.

The next step in the process is for the court to serve the complaint on the defendants. They will have time to file an answer or other responsive pleading (like a motion to dismiss). Once the defendants answer, the court will enter a scheduling order. At that time, the parties may engage in discovery—the exchange of information. During discovery, the plaintiff can ask the defendants to provide him with information that he believes he needs to prove his claims. He may ask the defendants up to twenty-five written questions (called interrogatories) and/or he may ask them to give him documents that they have in their possession. See Fed. R. Civ. P. 33 and 34; Civil L.R. 33.

The defendants may object to a request if they believe any request is improper. If the plaintiff does not think an objection is warranted, he should try to informally resolve the dispute with the defendants' lawyer by letter. See Civil L.R. 37. Most parties can resolve discovery disputes without the court's involvement. If the plaintiff and the defendants' lawyer are unable to resolve the dispute on their own, the plaintiff may file a motion asking the court to get involved. If the plaintiff asks the court to get involved, he must describe the discovery dispute in detail and explain what efforts the parties made to resolve the dispute before involving the court. As a reminder, although the plaintiff should direct his discovery requests to the defendants, he must *mail* his discovery requests (and any other communication) to their lawyer(s).

The court understands that it can be overwhelming for an inexperienced litigant to navigate the many rules and procedures of the court. As the case progresses, if the legal and factual issues become too complex for the plaintiff

or if he is unable to get the information he believes he needs to prove his claims, he may renew his request for a lawyer. The court also reminds the plaintiff that if ever he needs more time to do something, he may file a motion asking the court to give him more time, as long as he files it in time for it to reach the court *before* the deadline for doing the particular task expires.

**V.      Motion to Certify Class**

The plaintiff filed a motion to certify class. Dkt. No. 5. But his complaint does not name any other prisoners as plaintiffs (although he refers to himself on the first page as "Jason Allen Olrich, et al"); the plaintiff is the only one who signed the complaint. "[C]ourts have repeatedly declined to allow *pro se* prisoners to represent a class." Saldana v. Leyendecker, No. 16-cv-1577, 2017 WL 706304, at *3 (E.D. Wis. Feb. 22, 2017) (citing Howard v. Pollard, 814 F.3d 476, 478 (7th Cir. 2015); Oxendine v. Williams, 509 F.2d 1405, 1407 (4th Cir. 1975 (plain error to permit an imprisoned *pro se* litigant to represent fellow inmates in a class action); Lee v. Gardinez, No. 11-570, 2012 WL 143612, at *1 (S.D. Ill. Jan. 18, 2012); Fymbo v. State Farm Fire and Cas. Co., 213 F.3d 1320, 1321 (10th Cir. 2000). Under Federal Rule of Civil Procedure 23(a)(4), a named plaintiff must be able to provide the class with adequate representation. A critical factor in determining the adequacy of representation is the legal skill of those conducting the litigation. Sec'y of Labor v. Fitzsimmons, 805 F.2d 682, 697 (7th Cir. 1986) (*en banc*). Even a plaintiff well-versed in the law cannot provide representation that satisfies Rule 23. The court will deny this motion.

## VI.  Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepayment of the filing fee. Dkt. No. 2.

The court **DENIES without prejudice** the plaintiff's motion to appoint counsel. Dkt. No. 9.

The court **DENIES** the plaintiff's motion to certify class. Dkt. No. 5.

The court **DENIES** the plaintiff's motion to file an amended complaint; **DENIES** the plaintiff's motion to consolidate cases; and **DENIES as moot** the plaintiff's motion to stay screening until he files an amended complaint. Dkt. No. 13.

The court **DISMISSES** defendants Kenosha County, Kenosha County Detention Center, Kenosha County Jail, Sheriff David Beth, Jail Administrator, and Correctional Officer Haynes.

The court **ORDERS** the U.S. Marshals Service to serve a copy of the complaint and this order on defendants Corporal Parker and Correctional Officer Julian under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. § 1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§ 0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff

information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** defendants Parker and Julian to file a responsive pleading to the complaint.

The court **ORDERS** that the parties must not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court will issue a separate order **REFERRING** this case to Magistrate Judge Nancy Joseph for pretrial proceedings.

The court advises plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to prosecute. The parties must notify the clerk of court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

Dated in Milwaukee, Wisconsin, this 11th day of March, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**